919 So.2d 637 (2006)
M.E., Appellant,
v.
FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES, et al., Appellees.
No. 3D05-197.
District Court of Appeal of Florida, Third District.
January 25, 2006.
*638 Karl E. Hall, Jr., Miami, for appellant.
Calianne P. Lantz, for appellee Florida Department of Children and Families; and Mercedes E. Scopetta, for appellee Guardian Ad Litem Program.
Before SHEPHERD, SUAREZ, and ROTHENBERG, JJ.
ROTHENBERG, Judge.
M.E. ("the mother") appeals from an order terminating her parental rights as to D.E. ("the child"). As we conclude that the Department failed to present clear and convincing evidence to support the grounds alleged in its Amended Termination of Parental Rights Petition ("TPR Petition"), we reverse the order terminating the mother's parental rights.
At the time of the child's birth on August 24, 2001, the mother was a minor who was living with her maternal aunt and maternal cousin. When the child was approximately ten months old, the mother moved out of the aunt's home and moved *639 in with her boyfriend. Prior to leaving, the mother asked her cousin to care for the child. The cousin agreed to do so, as long as she was given "papers." The mother signed a paper indicating that she was giving the child to her cousin, and gave her cousin the child's birth certificate, social security card, and Medicaid card. Thereafter, the cousin contacted the Department of Children and Families ("Department"). The Department took the child into custody on June 21, 2002, alleging that the mother had neglected the child by not feeding or properly caring for him, and that based on the mother's mental and emotional limitations, the child was at risk of prospective harm. On June 25, 2002, a shelter hearing petition was filed, and the Department released the child to the cousin, giving her temporary custody of the child. Within the next two weeks, the mother came back twice stating that she had changed her mind. The second time, the mother returned with a police officer, asserting that her cousin had stolen the child.
On May 19, 2003, the mother entered into a consent plea, admitting that she had endangered the child's life, and the child was adjudicated dependent. Thereafter, in June 2003, a reunification case plan was entered, and it was later re-entered in September 2003, requiring the mother to attend parenting classes, individual therapy, and therapeutic visitation.
The mother began services in August 2003, at Our Children Our Future, and was then transferred to Barry University in September 2003. The services were terminated in late November or early December 2003, due to funding cuts. The Department did not refer the mother for any further individual therapy as of the date of the termination of parental rights hearing ["TPR hearing"] in June 2004.[1] However, in February 2004, the mother was referred for therapeutic visitations to the Center for Family and Child Enrichment ["CFCE"].[2]
A Judicial Review Hearing was held on April 10, 2003, and the trial court's Judicial Review Order/Permanency Hearing Order *640 was filed on December 9, 2003.[3] The order states that the mother was in partial compliance with individual counseling, visitation, and parenting classes, and therefore, she had not completed all of the tasks in her case plan. Moreover, following a hearing held on December 6, 2003, the trial court entered a Permanency Planning/Judicial Review Order on January 20, 2004. This order states that the mother was in non-compliance with the tasks assigned to her in the case plan.
On February 5, 2004, the Termination of Parental Rights Petition ("TPR Petition") was filed, and it was later amended on March 24, 2004. The Department sought termination based on the following grounds: 1) section 39.806(1)(c), Florida Statutes (2004), which provides that irrespective of services, the parent's continuing involvement with the child threatens the child's safety, well-being, and health; 2) section 39.806(1)(e), Florida Statutes (2004), which provides that the failure of a parent to substantially comply with a case plan, constitutes evidence of continuing abuse, abandonment, or neglect; and 3) section 39.806(1)(b), Florida Statutes (2004), which provides that the parent has abandoned the child as defined in section 39.01(1), Florida Statutes (2004), if the parent, while being able, makes no provision for the support of the child and no effort to communicate with the child.[4]
The TPR hearing began on June 22, 2004, and ended on June 25, 2004. At the hearing, the cousin and the aunt testified as to several negative incidents involving the mother and the child. Moreover, the Department's Family Services Counselor, *641 Ms. Thomas, and the guardian ad litem testified, recommending that the mother's parental rights be terminated.
The testimony of Dr. Sandra Klein, the psychologist who evaluated the mother, reflects that she conducted a psychological evaluation on the mother in October 2002, and that the evaluation showed that the mother, who was then eighteen years old, had an IQ of approximately 61, which is considered in the mentally deficient range. Based upon her evaluation, Dr. Klein recommended that the mother be referred to several services, including individual therapy. Dr. Klein acknowledged that her recommendation for individual therapy was not carried out because the counseling the mother received was not consistent.
Dr. Klein reevaluated the mother on June 24, 2004, two days into the TPR hearing. Dr. Klein's written report states that the mother's IQ was 63, and that:
[The mother] continues to present as an individual who is immature, child like [sic], and irresponsible. Her inability to take a proactive approach in bettering herself and her situations is very disturbing and troubling. Complicating matters is the client's lack of insight and continual exoneration from blame.
Furthermore, [the mother] manifests complication with respect to relating to her world in a logical and organized manner. She evidences disturbance in the form of thought, in that she seems to live in a dream-like reality.
Of additional concern, is that [the mother] is not aware of her character pathology and therefore, is not accessible to modify her behaviors and mannerisms. . . .
On a positive note, Dr. Klein's report indicates that during the family observation, the mother was very attentive, affectionate, nurturing, and caring with the child, and that it "appeared that there is some mutual bonding" between the mother and the child.
At the TPR hearing, during the mother's counsel's cross-examination of Dr. Klein, the following colloquy transpired:
[DR. KLEIN]: The particular characteristics that [the mother] appears to present with are these character deficits, if you will, such as lack of insight; inability to be productive; lack of motivation; lack of effort. And these are particular issues that, as I mentioned, take time to resolve if they are ever resolved." (emphasis added).
[MOTHER'S COUNSEL]: And is it correct, doctor, that your primary recommendation, from your perspective as a clinical psychologist, to attempt to resolve these issues is with specific individual counseling?
[DR. KLEIN]: To attempt to resolve them would be, however it is my understanding that this attempt has already been applied and has not been successful.
[MOTHER'S COUNSEL]: Have you spoken to anyone at Barry University regarding their input on the mother's development, or lack thereof, in therapy?
[DR. KLEIN]: No.
. . .
[MOTHER'S COUNSEL]: And doctor, would you agree, that given her background: pregnant at 17; mother abandoned her; her second caretaker, grandmother, died; the family she lived with she has conflict with, that she probably is not going to be able to accomplish those changes without professional assistance?
[DR. KLEIN]: It would be very unlikely that she is going to be able to better those particular issues all on *642 her own. However, I'd like to mention that there's no guarantee, with the most professional intervention, that she's also going to be able to come to terms with that. (emphasis added).
Following Dr. Klein's testimony, the parties gave closing arguments. Thereafter, the trial court orally held that it was terminating the mother's parental rights on the following grounds, which the Department established by clear and convincing evidence: 1) pursuant to section 39.806(1)(c), because the mother's conduct toward the child indicates that her continuing involvement with the child would threaten the child's life, safety, well-being or physical, mental or emotional health, irrespective of the provision of services; and 2) pursuant to section 39.806(1)(e) due to the mother's failure to comply with her case plan. Moreover, the trial court also found that termination was warranted pursuant to section 39.806(1)(b) because the mother had abandoned the child as defined in section 39.01(1). In finding abandonment, the trial court stated, "The finding of abandonment pretty much rests on the initial abandonment," and that the mother's conduct since the initial abandonment demonstrates that she does not evince a settled purpose to assume her parental duties. On November 24, 2004, approximately five months after the TPR hearing, the trial court entered its written order terminating the mother's parental rights.
The mother contends that the trial court's finding, that her continuing involvement with the child would threaten his life, safety, well-being or health, irrespective of the provision of services, pursuant to section 39.806(1)(c), is not supported by the evidence. We agree.
In construing section 39.806(1)(c), the Second District explained that
"[i]rrespective of" means "independent or regardless of." Webster's Third New Int'l Dictionary 1196 (1986). Thus, in order to terminate parental rights under section 39.806(1)(c), the trial court must find that the child's life, safety, or health would be threatened by continued interaction with the parent regardless of any services provided to the parent. In essence, the trial court must find that any provision of services would be futile or that the child would be threatened with harm despite any services provided to the parent.
C.W.W. v. State of Fla., Dep't of Children & Families, 788 So.2d 1020, 1023 (Fla. 2d DCA 2001)(emphasis added); see In re J.B., 30 Fla. L. Weekly D2779, 2005 WL 3334379 (Fla. 2d DCA Dec. 9, 2005)(holding that trial court reversibly erred by terminating parental rights under section 39.806(1)(c) when parent has demonstrated improvement and further improvement is possible); I.R. v. Dep't of Children & Family Servs., 904 So.2d 583 (Fla. 3d DCA 2005)(holding that trial court erred by terminating parental rights pursuant to section 39.806(1)(c), when the Department deprived the mother of a viable opportunity to complete her case plan and the record did not demonstrate that the mother failed to benefit from the services the Department did provide).
In the instant case, the order terminating the mother's parental rights provides that Ms. Thomas, the Department's Family Service Counselor, "testified that appropriate services were in place for the Mother, including individual therapy and therapeutic visits." There is no doubt that this finding is not supported by the record. As stated earlier, the record clearly demonstrates that the mother received both therapeutic visitations and individual therapy from August 2003 to late November or early December 2003, at which point, the services were terminated due to budget cuts. Thereafter, the *643 mother was referred for therapeutic visitations in February 2004, resulting in, as characterized by the trial court, a "hiatus." The Department, however, did not refer the mother to another provider for individual therapy, as recommended by Dr. Klein and required by the case plan. As a result, for the seven months preceding the TPR hearing, the mother did not receive the individual therapy that she so desperately needed.
The Department argues that its failure to refer the mother for further individual counseling does not warrant reversal of the order terminating parental rights, as the trial court found that "further referrals for services would be futile."[5] We disagree, as this finding is not supported by substantial, competent evidence.
The record before this court does not indicate that the provision of further services would be futile. For example, in a Status Report dated March 31, 2004, a therapist at CFCE indicated that the mother resumed therapeutic visitations on March 12, 2004; that the family attended all scheduled meetings for the month of March 2004; and that "[i]nterventions between [the child] and his biological mother were clinically effective." (emphasis added). In addition, the Guardian Ad Litem Amended Judicial Report, which was filed on April 15, 2004, just two months prior to the TPR hearing, states that the counselor at Barry University "found the mother to be making progress." In addition, Dr. Klein's Psychological Assessment and Family Observation report, dated June 24, 2004, does not indicate that the provision of services would be futile. Rather, the report indicates that the mother's prospect for becoming a more proactive mother is "very low" and the mother's character pathology will take a long time to resolve, if it can be resolved. These findings do not indicate that the provision of further services would be futile. Specifically, the report provides in part:
[The mother] clearly loves her son. She seems to have gained some knowledge and awareness with regard to parenting skills and appropriate behaviors toward [the child]. However, the prospect for [the mother's] capacity to become more mature, more responsible, more insightful, and more proactive, is very low. . . .
. . .
With regard to treatment, characterological pathology as is evidenced by [the mother], takes a long time to resolve, if it is ever resolved. . . .
Therefore, we conclude that the Department failed to establish by clear and convincing evidence that the mother's conduct toward the child indicates that her continuing involvement with the child would threaten the child's life, safety, well-being or physical, mental or emotional health, irrespective of the provision of services, thereby warranting termination pursuant to section 39.806(1)(c). See J.F. v. Dep't of Children & Families, 890 So.2d 434, 438 (Fla. 4th DCA 2004)(holding that parental rights could not be terminated pursuant to section 39.806(1)(c) where Department failed to establish by clear and convincing evidence that long-term therapy would not improve mother's anger management problems).
*644 The mother also contends that the trial court erred by terminating her parental rights pursuant to section 39.806(1)(e). We agree.
Pursuant to section 39.806(1)(e), Florida Statutes (2004), parental rights may be terminated if the parent fails to substantially comply with a case plan. "However, the failure to comply with a case plan may not be used as a ground for termination of parental rights if the failure is due to the parent's lack of financial resources or the failure of the department to make reasonable efforts to reunify the parent and child." K.J. v. Dep't of Children & Family Servs., 906 So.2d 1183 (Fla. 4th DCA 2005); see T.M. v. Dep't of Children & Families, 905 So.2d 993, 997 (Fla. 4th DCA 2005)(holding that parental rights cannot not be terminated pursuant to section 39.806(1)(e) where the "Department made no effort to assist the father in securing the type of services he would need to substantially comply with his case plan. . . ."); J.F., 890 So.2d at 439 (holding that evidence did not support termination of parental rights under section 39.806(1)(e), for failing to substantially comply with case plan, where mother failed to complete intensive therapy, as required under case plan, "because of various problems, not attributable to her"); P.A. v. Dep't of Health & Rehabilitative Servs., 685 So.2d 92, 93 (Fla. 4th DCA 1997)(holding that Department "did not meet its statutory responsibilities," when it failed to help parent receive the services required under the case plan, and termination of parental rights was not proper if parent's "ability to comply was affected by the department's failure to provide reasonable assistance").
In the instant case, pursuant to her case plan, the mother was required to attend parenting classes, therapeutic visitations, and individual counseling. The record demonstrates that the mother completed her parenting classes, and that the mother's failure to complete the therapeutic visitations and the individual counseling, was, in part, attributable to the Department, not the mother. We acknowledge that during the few months that the Department was providing the mother with therapeutic visitations and individual counseling, her attendance was not perfect. However, this does not excuse the Department's failure in making reasonable efforts to secure the type of services required under the case plan.
Finally, the mother asserts that the trial court erred by terminating her parental rights pursuant to section 39.806(1)(b). We agree.
As recognized by the trial court, the "finding of abandonment pretty much rests on the initial abandonment." The record before this court demonstrates that, following the initial abandonment in June 2002, the mother made more than marginal efforts to communicate with the child. In addition, although the record demonstrates that the mother failed to provide for the child's support, this alone does not warrant a finding of abandonment as the record indicates that the mother lacked the ability to do so. Therefore, we do not find that the Department established by clear and convincing evidence that the mother "abandoned" the child as defined in section 39.01(1).
Accordingly, we reverse the order terminating the mother's parental rights, and remand for further proceedings.
NOTES
[1] At oral argument, the Department's attorney argued that Katina Thomas, the Department's Family Service Counselor, testified that after the mother's individual therapy was discontinued in late November or early December 2003, the mother was referred for individual counseling in February 2004. Based on her understanding of Ms. Thomas' testimony, the Department's counsel argued that the lapse in the mother's therapy was approximately two months, not seven months as asserted by the mother's attorney. Consistent with the mother's attorney's representation, a review of Ms. Thomas' testimony reflects that the lapse in individual therapy was seven months:

THE COURT: In January of this year[,] Judge Lederman signed an order on a judicial review, as I recall, correct me if I'm wrong, finding the non-compliance, etcetera. And since then I have no doubt that this counseloras I understand what this counselor said, she's got the mother back in therapy and counseling at ___
[MOTHER'S COUNSEL]: No, that's the point, Your Honor. She doesn't.
THE COURT: Oh, it's just thewhat's going on at the Center for Family and Child Enrichment.
[MS. THOMAS]: Therapeutic visits.
THE COURT: Therapeutic visits, okay. There is no therapy going on at this point.
[MOTHER'S COUNSEL]: That's the point.
THE COURT: Okay.
[2] A Judicial Review Social Study Report filed on April 15, 2004, indicates that the mother was referred for therapeutic visitations on February 10, 2004, but that it did not resume until March 12, 2004, at CFCE. It is also interesting to note that this order indicates that the mother was in non-compliance for the individual counseling task, although on the date that the order was entered, there was no referral in place for individual counseling.
[3] The record does not indicate why there was an eight month lapse between the hearing and the filing of the trial court's order.
[4] Subsections 39.806(1)(b), (c) and (e) provide as follows:

(1) The department, the guardian ad litem, or any person who has knowledge of the facts alleged or who is informed of those facts and believes that they are true may petition for the termination of parental rights under any of the following circumstances:
. . .
(b) Abandonment as defined in s. 39.01(1). . . .
(c) When the parent or parents engaged in conduct toward the child or toward other children that demonstrates that the continuing involvement of the parent or parents in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services. Provision of services may be evidenced by proof that services were provided through a previous plan or offered as a case plan from a child welfare agency.
. . .
(e) A petition for termination of parental rights may also be filed when a child has been adjudicated dependent, a case plan has been filed with the court, and the child continues to be abused, neglected, or abandoned by the parents. In this case, the failure of the parents to substantially comply for a period of 12 months after an adjudication of the child as a dependent child or child's placement into shelter care, whichever came first, constitutes evidence of continuing abuse, neglect or abandonment unless the failure to substantially comply with the case plan was due either to the lack of financial resources of the parents or to the failure of the department to make reasonable efforts to reunify the parent and child. . . .
In addition, section 39.01(1), Florida Statutes (2004), provides:
"Abandoned" means a situation in which the parent . . ., while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If the efforts of such parent . . ., to support and communicate with the child are, in the opinion of the court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. . . .
[5] Throughout its brief and oral argument, the Department argued that the "hiatus" in the mother's individual therapy was for a two month period. However, as already discussed, the record clearly demonstrates that she did not receive any therapy for the seven months preceding the TPR hearing.